# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) PRODUCTS LIABILITY LITIGATION | MDL NO. 3094<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| ERICA PARADIS,<br>*Plaintiff,*<br><br>v.<br><br>NOVO NORDISK A/S and NOVO NORDISK INC.,<br>*Defendants.* | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: 2:24-cv-3647 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

----------------------------------------------------------------------------------------------------

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court.  Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the District of Massachusetts as Plaintiff's designated venue ("Original Venue").  Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

X Plaintiff currently resides in Dracut, MA (City/State).

X Plaintiff purchased and used Defendant(s)' products in Lowell, MA (City/State).

__ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): District of Massachusetts.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain): _____.

## NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiff, ERICA PARADIS, who was severely injured as a result of Plaintiff's use of Ozempic, an injectable prescription medication that is used to control blood sugar and to reduce cardiovascular risk in adults with type 2 diabetes, and Wegovy, an injectable prescription medication that is used to aid weight loss in adults and teens with obesity or excess weight and at least one weight-related comorbid condition.

2.     Ozempic is known as a semaglutide.

3.     Wegovy is also known as semaglutide.

4.     Ozempic and Wegovy work by stimulating insulin production and reducing glucose production in the liver helping to lower blood sugar levels.

5.     Ozempic and Wegovy belong to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

6.     Defendants acknowledge that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[1] However, Defendants have downplayed the severity of the gastrointestinal events caused by its GLP-1RAs, never, for example, warning of the risk of gastroparesis ("paralyzed stomach") and its sequelae.

7.     Gastroparesis is a condition that affects normal muscle movement in the stomach. Ordinarily, strong muscular contractions propel food through the digestive tract. However, in a person suffering from gastroparesis, the stomach's motility is slowed down or does not work at all, preventing the stomach from emptying properly. Gastroparesis can interfere with normal digestion and cause nausea, vomiting (including vomiting of undigested food), abdominal pain, abdominal bloating, severe dehydration, a feeling of fullness after eating just a few bites, undigested food hardening and remaining in the stomach, acid reflux, changes in blood sugar

levels, lack of appetite, weight loss, malnutrition, and a decreased quality of life. There is no cure

for gastroparesis.[2]

## PARTY PLAINTIFF

8.      Plaintiff, ERICA PARADIS, is a citizen of the United States, and is a resident of

the Commonwealth of Massachusetts.

9.      Plaintiff is forty-five (45) years old.

10.     Plaintiff used Ozempic from approximately August 2022 to May 2023.

11.     Plaintiff used Wegovy from approximately December 2022 to August 2023.

12.     Plaintiff's physician(s) ("prescribing physician(s)") prescribed the Ozempic and

Wegovy that was used by Plaintiff.

13.     As a result of using Ozempic and Wegovy, Plaintiff was caused to suffer from

gastroparesis and its sequelae and, as a result, sustained severe and permanent personal injuries,

pain, suffering, and emotional distress, and incurred medical expenses.

14.     As a result of using Ozempic and Wegovy, Plaintiff was caused to suffer from

gastroparesis and its sequelae, which resulted in, for example, constant nausea and severe vomiting

that required emergency medical treatment.

## PARTY DEFENDANTS

15.     Defendant Novo Nordisk Inc. is a Delaware corporation with a principal place of

business at 800 Scudders Mill Road, Plainsboro, New Jersey.

16.     Defendant Novo Nordisk A/S is a public limited liability company organized under

the laws of Denmark with a principal place of business in Bagsværd, Denmark.

17.     Defendants Novo Nordisk Inc. and Novo Nordisk A/S are referred to collectively

herein as "Novo Nordisk."

18.     Novo Nordisk designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic and Wegovy. Alternatively, Novo Nordisk has acquired the entity/entities who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic and Wegovy and is, thus, the successor to such entity/entities.

### FACTUAL BACKGROUND

**A. FDA's Approval of Ozempic**

19.     On December 5, 2016, Novo Nordisk announced submission of a new drug application (NDA) to the FDA for regulatory approval of once-weekly injectable semaglutide, a new glucagon-like peptide-1 (GLP-1) medication for treatment of type 2 diabetes. In the announcement, Novo Nordisk represented that in clinical trials "once-weekly semaglutide had a safe and well tolerated profile with the most common adverse event being nausea."[3]

20.     On December 5, 2016, Defendant Novo Nordisk Inc. submitted NDA 209637, requesting that the FDA grant it approval to market and sell Ozempic (semaglutide) 0.5 mg or 1 mg injection in the United States as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On December 5, 2017, the FDA approved NDA 209637.[4]

21.     On March 20, 2019, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 209637/S-003 for Ozempic (semaglutide) 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[5] On January 16, 2020, the FDA approved sNDA 209637/S-003.[6]

22.     On May 28, 2021, Defendant Novo Nordisk Inc. submitted sNDA 209637/S-009, requesting approval for a higher 2 mg dose of Ozempic (semaglutide) injection. On March 28,

2022, the FDA approved sNDA 209637/S-009.7

**B. FDA's Approval of Wegovy**

23.    On December 4, 2020, the Novo Nordisk Defendants announced submission of a new drug application (NDA) to the FDA for regulatory approval of subcutaneous semaglutide 2.4 mg, a once-weekly glucagon-like peptide-1 (GLP-1) medication for chronic weight management. In the announcement, the Novo Nordisk Defendants represented that "once-weekly semaglutide 2.4 appeared to have a safe and well-tolerated profile" and "[t]he most common side effects were gastrointestinal and were transient, and mild or moderate in severity."8

24.    On December 4, 2020, Defendant Novo Nordisk Inc. submitted NDA 215256, requesting that the FDA grant it approval to market and sell Wegovy (semaglutide) injection in the United States as an adjunct to a reduced calorie diet and increased physical activity for chronic weight management in adults with an initial body mass index (BMI) of either 30/kg/m2 or greater (obese), or 27 kg/m2 or greater (overweight) in the presence of at least one weight-related comorbid condition. On June 4, 2021, the FDA approved NDA 215256.9

25.    On June 29, 2022, Defendant Novo Nordisk Inc. submitted supplemental new drug application (sNDA) 215256/S-005 for Wegovy (semaglutide) injection, requesting approval for the addition of an indication for use in adolescents 12 years and older with an initial BMI at or above the 95th percentile for age and sex. On December 23, 2022, the FDA approved sNDA 215256/S-005.10

26.    On December 23, 2022, the Novo Nordisk Defendants announced the FDA's approval of sNDA 215256/S-005 for a new indication of Wegovy to treat obesity in teens aged 12 years and older. In the press release, the Novo Nordisk Defendants touted the "safety and efficacy of Wegovy as a treatment for adolescents with obesity[.]"11 As with its prior press releases, the

Novo Nordisk Defendants disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information, but gastroparesis was not identified as a side effect or risk.

27.     On September 23, 2022, Defendant Novo Nordisk Inc. submitted sNDA 215256/S-007, requesting approval for an update to the Prescribing Information and Medication Guide to include Wegovy (semaglutide) 1.7 mg subcutaneous weekly as an additional maintenance dose. On July 21, 2023, the FDA approved sNDA 215256/S-007.12

**C. Novo Nordisk's Marketing and Promotion of Ozempic**

28.     On December 5, 2017, Novo Nordisk announced the FDA's approval of Ozempic (semaglutide) 0.5 mg or 1 mg injection in a press release stating that: "Novo Nordisk expects to launch OZEMPIC® in the U.S. in Q1 2018, with a goal of ensuring broad insurance coverage and patient access to the product. OZEMPIC® will be priced at parity to current market-leading weekly GLP-1RAs and will be offered with a savings card program to reduce co-pays for eligible commercially-insured patients. Additionally, as part of the access strategy, Novo Nordisk is working with appropriate health insurance providers to establish innovative contracting solutions."13

29.     On February 5, 2018, Novo Nordisk announced that it had started selling Ozempic in the United States and touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."14

30.     Novo Nordisk promoted the safety and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

31.    On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic, to the tune of the 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that "adults lost on average up to 12 pounds" when taking Ozempic, even though it is not indicated for weight loss.15

32.    On March 28, 2022, Novo Nordisk announced the FDA's approval of sNDA 209637/S-009 for a higher 2 mg dose of Ozempic (semaglutide) injection. In the press release, Novo Nordisk represented Ozempic as having "proven safety" and advertised that "plus it can help many patients lose some weight."16

33.    Since 2018, Novo Nordisk has spent more than $884,000,000 on television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus) with the majority of the spending allocated specifically to advertising Ozempic.17

34.    In 2022, Novo Nordisk spent $180.2 million on Ozempic ads, including an estimated $157 million on national television ads for Ozempic, making Ozempic the sixth most advertised drug that year. As a result of its GLP-1RA treatments, including Ozempic, Novo Nordisk forecasts sales growth of 13% to 19% for 2023.18

35.    On July 6, 2023, it was reported that Novo Nordisk had spent $11 million in 2022 on food and travel for doctors "as part of its push to promote Ozempic and other weight loss-inducing diabetes drugs."19 The spending bought more than 457,000 meals for almost 12,000 doctors while also flying doctors to places like London, Paris, Orlando, and Honolulu.20

36.    In an article published on July 21, 2023, the President and CEO of the Alliance of Community Health Plans described Novo Nordisk's spending on meals for doctors as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about potential side effects and long-term

effectiveness. The author cited research published in the spring of 2023 showing an increased risk of intestinal obstruction as a result of using GLP-1RA drugs.21

37.    As a result of Novo Nordisk's advertising and promotion efforts, Ozempic has been widely used throughout the United States. The number of prescriptions filled reached an all-time high of 373,000 in one week in February of 2023, with more than half of those being new prescriptions.22 In June 2023, it was reported that new prescriptions for Ozempic had surged by 140 percent from the prior year.23

38.    On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,24 and currently has over 1.3 billion views.25

39.    On June 15, 2023, NBC News published a report about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." While many of those ads were found to be from online pharmacies, medical spas, and diet clinics, as of June of 2023, Novo Nordisk was still running online social-media ads for its semaglutide products, despite claiming in May that it would stop running ads due to a shortage of the drug.26

40.    On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."27

41.    At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Ozempic.

**D.  Novo Nordisk's Marketing and Promotion of Wegovy**

42.    On June 4, 2021, the Novo Nordisk Defendants announced the FDA's approval of Wegovy (semaglutide) injection 2.4 mg in press releases stating that it is "the first-and-only prescription weight-loss medication with once-weekly dosing." Novo Nordisk described Wegovy as having "unprecedented efficacy"  and quoted its executive vice president of Development as

saying that "'[t]he approval of Wegovy in the US brings great promise to people with obesity."28

43.     According to an article published in September 2021, the Novo Nordisk Defendants' launch of Wegovy in the U.S. was one of the fastest ever for the organization, with the sales team on the field with the drug just 72 hours after its FDA approval and the drug on the shelves days later. The head of North America operations and president of Novo Nordisk U.S. explained that the drug had sped quickly through the FDA approval process thanks to a priority review voucher and the company working under a condensed timeline.29

44.     On August 4, 2021, the Novo Nordisk Defendants announced that "the 2021 outlook for sales growth was expected to be 10-13% at CER (previously 6-10%), and operating profit growth was expected to be 9-12% at CER (previously 5-9%)" after reporting that "[i]n June 2021, Wegovy, semaglutide 2.4 mg, was made available to patients in the US following the approval from the US Food and Drug Administration (FDA) for weight management in adults living with obesity."30

45.     Novo Nordisk promoted the safety and sale of Wegovy in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and through other public outlets.

46.     In November 2021, it was reported that the Novo Nordisk Defendants had launched an obesity awareness campaign called "It's Bigger Than Me" ahead of its planned Direct to Consumer ads for the recently approved Wegovy. Novo Nordisk Defendants worked with actress Queen Latifah to create a series of videos, which appeared on YouTube, Instagram, and a dedicated website, in order to change minds about obesity. One article described the video series as "Novo Nordisk tak[ing] a page from three popular TV genres—medical drama, '90s sitcom and procedural crime show—" in order to steer the narrative about obesity "away from 'blame, shame,

bias, and stigma' and toward empathy and understanding[.]"31

47.    In October 2021, the Novo Nordisk Defendants rolled out a physician education site Rethink Obesity, to persuade doctors to discuss obesity treatment with patients.32

48.    In the weeks leading up to the drug's release to pharmacies, the Novo Nordisk Defendants also hosted doctor events to spread the word about Wegovy.33

49.    On February 2, 2022, Novo Nordisk announced its 2021 financial report, in which it reported that its North America operations had increased obesity care sales by 83% at constant exchange rates (CER), reflecting the launch of Wegovy in June 2021.34 An article reporting on the announcement stated that in 2021, Novo Nordisk earned approximately $1.2 billion from sales of Wegovy and its earlier weight loss treatment Saxenda and that Novo Nordisk aimed to increase obesity drug sales to more than $3.7 billion.35

50.    Since 2018, Novo Nordisk has spent more than $884,000,000 on television ads in the United States to promote its semaglutide drugs (Ozempic, Wegovy and Rybelsus).36

51.    On July 5, 2023, it was reported that the Novo Nordisk Defendants had spent $11,000,000 on food and travel for doctors as part of their efforts to promote their GLP-1 medications, including Wegovy. In 2022 alone, the Novo Nordisk Defendants bought more than 457,000 meals to educate doctors and other prescribers about its GLP-1s, with nearly 12,000 doctors receiving more than 50 meals and snacks from Defendants. In 2022, the Novo Nordisk Defendants also spent $2 million flying doctors to London, Paris, Orlando, and Honolulu related to its GLP-1s.37

52.    On July 21, 2023, it was reported that Novo Nordisk had purchased more than 457,000 meals—at a total price of more than $9 million—to educate prescribers about Wegovy and its other GLP-1s. The president and CEO of the Alliance of Community, who was interviewed

for the article, described the expenditures as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about their potential side effects and long-term effectiveness. The author pointed out that research published in spring 2023 "suggested that GLP-1s could put patients at an elevated risk of a potentially fatal gastrointestinal condition that requires surgery."38

53.    In an article published on July 21, 2023, the President and CEO of the Alliance of Community Health Plans described Novo Nordisk's spending on meals for doctors as "outrageous" and suggested that the millions Novo Nordisk spent marketing its drugs to prescribers would be better used furthering research about potential side effects and long-term effectiveness. The author cited research published in the spring of 2023 showing an increased risk of intestinal obstruction as a result of using GLP-1RA drugs.39

54.    As a result of the Novo Nordisk Defendants' advertising and promotion efforts, Wegovy has been widely used throughout the United States. The number of prescriptions filled reached over 100,000 per week in May 2023, with more than 30,000 of those being new prescriptions.40

55.    On TikTok, the hashtag #Wegovy currently has over 555 million views, and the hashtag #wegovyweightloss currently has over 165 million views.41

56.    On June 15, 2023, NBC News published a report about the "thousands of weight-loss ads on social media for the drugs Ozempic and Wegovy." While many of those ads were found to be from online pharmacies, medical spas, and diet clinics, as of June of 2023, Novo Nordisk was still running online social-media ads for its semaglutide products, despite claiming in May that it would stop running ads due to a shortage of the drug.42

57.    On May 5, 2023, it was reported that Novo Nordisk would limit distribution of its

low-dose versions of Wegovy to ensure that people already taking the drug would have enough supply amidst shortages of the drug caused by a boom in sales due to celebrity endorsements. The company announced that it was serving hundreds of thousands of U.S. patients with Wegovy but trends indicated that demand for Wegovy in the U.S. would exceed current supply capacity.43

58.     On June 20, 2023, it was reported that Wegovy was on track for sales of over $4 billion this year in the U.S. alone, despite the Novo Nordisk Defendants' struggle to keep up with demand for the drug. One analyst described the prescription growth trend for the GLP-1 class of drugs as 80 percent in diabetes and 313 percent in obesity and said that the market opportunity for Novo Nordisk and its main competitor could be $40 billion.44

59.     On August 10, 2023, an investment site reported that Novo Nordisk had raised its outlook as revenue from Wegovy skyrocketed 537% to $1.1 billion in the second quarter. Total sales were up 32% to $8 billion, with a profit of $2.9 billion, even though Novo Nordisk had cut its supply of starter doses starting in May 2023.45

60.     At all relevant times, Novo Nordisk was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Wegovy.

**E.  The Medical Literature and Clinical Trials Gave Defendants Notice of Gastroparesis Being Causally Associated with GLP-1RAs**

61.     As previously noted, Ozempic (semaglutide) and Wegovy (semaglutide) belong to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs").

62.     Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, which is a gut hormone that activates the GLP-1 receptor in the pancreas to stimulate the release of insulin and suppress glucagon.46

63.     Because the risk of gastroparesis is common to the entire class of drugs, any published literature regarding the association between gastroparesis and any GLP-1RA (such as

tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk of gastroparesis associated with these drugs.

64.     In addition to pancreatic effects, the published medical literature shows that GLP-1 slows gastric emptying. As early as 2010, a study published in The Journal of Clinical Endocrinology & Metabolism indicated this effect.47

65.     Defendants knew or should have known of this risk of gastroparesis from the clinical trials, medical literature, and case reports.

66.     A 2016 trial funded by Novo Nordisk measuring semaglutide and cardiovascular outcomes in patients with type 2 diabetes found more gastrointestinal disorders in the semaglutide group than in the placebo group, including a severe adverse event report of impaired gastric emptying with semaglutide 0.5 mg together with other serious gastrointestinal adverse events such as abdominal pain (upper and lower), intestinal obstruction, change of bowel habits, vomiting, and diarrhea.48

67.     Two subjects in a semaglutide trial pool by Novo Nordisk reported moderate adverse events of impaired gastric emptying and both subjects permanently discontinued treatment due to the adverse events. Three subjects also reported mild adverse events of impaired gastric emptying in the semaglutide run-in period of trial 4376. The cardiovascular outcomes trials included two cases of gastroparesis with the first subject being diagnosed with severe gastroparesis after one month in the trial and second subject being diagnosed with gastroparesis after approximately two months in the trial.

68.     A study published in 2017 evaluated the effect of GLP-1RAs on gastrointestinal tract motility and residue rates and explained that "GLP-1 suppresses gastric emptying by

inhibiting peristalsis of the stomach while increasing tonic contraction of the pyloric region." The study authors concluded that the GLP-1RA drug liraglutide "exhibited gastric-emptying delaying effects" and "the drug also inhibited duodenal and small bowel movements at the same time."[49]

69.    Another study in 2017 reviewed the survey results from 10,987 patients and 851 physicians and found that "GI-related issues were the top two patient-reported reasons for GLP-1RA discontinuation in the past 6 months, with 'Made me feel sick' as the most frequently reported reason (64.4%), followed by 'Made me throw up' (45.4%)."[50] As explained above, these are symptoms of gastroparesis.

70.    A 2019 study of the GLP-1RA drug dulaglutide identified adverse events for impaired gastric emptying and diabetic gastroparesis.

71.    In August of 2020, medical literature advised that some "patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as ... semaglutide ... to manage their blood glucose." The article went on to explain that "[t]his class of drugs can exacerbate the symptoms of diabetic gastroparesis. ... Thus, GLP-1 receptor agonist therapy is not recommended for people who experience symptoms of gastroparesis."[51]

72.    In a September 2020 article funded and reviewed by Novo Nordisk, scientists affiliated with Novo Nordisk reported on two global clinical trials that evaluated the effect of semaglutide in patients with cardiovascular events and diabetes. More patients permanently discontinued taking oral semaglutide (11.6%) than placebo (6.5%) due to adverse events. The most common adverse events associated with semaglutide were nausea (2.9% with semaglutide versus 0.5% with placebo), vomiting (1.5% with semaglutide versus 0.3% with placebo), and diarrhea (1.4% with semaglutide versus 0.4% with placebo). Injectable semaglutide had a discontinuation rate of 11.5-14.5% (versus 5.7-7.6% with placebo) over a two-year period. The authors

acknowledged the potential for severe gastrointestinal events, warning that "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal function when initiating or escalating doses of oral semaglutide." For patients with other comorbidities, the study warned that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs." The study further identified as one "key clinical take-home point" that "patients should be made aware of the occurrence of gastrointestinal adverse events with GLP-1RAs."52

73.    A July 2021 article funded and reviewed by Novo Nordisk considered 23 randomized control trials conducted across the United States, Japan, and China and concluded that "gastrointestinal disturbances" were "well-known" side effects associated with semaglutide use. When compared with placebos, the subcutaneous (injection) form of the drug induced nausea in up to 20% of patients (versus up to 8% on the placebo group), vomiting in up to 11.5% of patients (versus up to 3% in the placebo group) and diarrhea in up to 11.3% of patients (versus up to 6% in the placebo group). Overall, the percentage of patients experiencing adverse events that led to trial product discontinuation was greatest for gastrointestinal related adverse events, with some trials experiencing 100% discontinuation due to gastrointestinal related adverse events. The mean value of gastrointestinal related adverse events that led to discontinuation averaged 57.75%. The study acknowledges that while nausea and vomiting are unwanted side effects, "they may be partly responsible for aspects of the drug's efficacy[.]"53

74.    An October 2021 article in the Journal of Investigative Medicine ("JIM") concluded that because gastroparesis can be associated with several medications, "[i]t is crucial to identify the causative drugs as discontinuation of the drug can result in resolution of the symptoms[.]" In diabetics, making this determination can be particularly "tricky" because both diabetes and GLP-1RAs can cause delayed gastric emptying. As such, "the timeline of drug initiation and symptom

onset becomes of the upmost importance." The authors reviewed two case reports (discussed below) and concluded that history taking and making an accurate diagnosis of diabetic gastroparesis versus medication-induced gastroparesis is critical.54

75.    Case Report #1 in JIM involved a 52-year-old female with long-standing (10 years) well-controlled, type 2 diabetes who had been taking weekly semaglutide injections approximately one month prior to the onset of gastroparesis symptoms. The patient was referred with a 7-month history of post-prandial epigastric pain, accompanied by fullness, bloating, and nausea. A gastric emptying study showed a 24% retention of isotope in the patient's stomach at four hours, indicative of delayed gastric emptying. The patient discontinued semaglutide and her symptoms resolved after six weeks. The case report authors concluded that "thorough history taking revealed the cause [of gastroparesis] to be medication induced."55

76.    Case Report #2 in JIM involved a 57-year-old female with a long-standing (16 years) type 2 diabetes who had been taking weekly dulaglutide injections (another GLP-1RA) for 15 months and suffering from abdominal bloating, nausea, and vomiting for 12 of those months. A gastric emptying study showed 35% retention of isotope in the patient's stomach at four hours, indicating delayed gastric emptying. After discontinuing dulaglutide, the patient experienced a gradual resolution of symptoms over a four-week period.56

77.    A June 2022 study reported GLP-1RA Mounjaro (tirzepatide) adverse events of vomiting, nausea, and "severe or serious gastrointestinal events."57

78.    An October 2022 study analyzed 5,442 GLP-1RA adverse gastrointestinal events. 32% were serious, including 40 deaths, 53 life-threatening conditions, and 772 hospitalizations. The primary events were nausea and vomiting. There were also adverse events for impaired gastric emptying.58

79.    A January 2023 meta-analysis of GLP-1RA (Mounjaro) adverse events reported high rates of nausea and vomiting.59

80.    In February 2023, a longitudinal study of GLP-1RA (dulaglutide) reported adverse events for nausea and vomiting, and one adverse event of impaired gastric emptying.60

81.    On March 28, 2023, a case study concluded that impaired gastric emptying is "a significant safety concern, especially since it is consistent with the known mechanism of action of the drug."61

82.    On June 29, 2023, the American Society of Anesthesiologists ("ASA") warned that patients taking semaglutide and other GLP-1RAs should stop the medication at least a week before elective surgery because these medications "delay gastric (stomach) emptying" and "the delay in stomach emptying could be associated with an increased risk of regurgitation and aspiration of food into the airways and lungs during general anesthesia and deep sedation." The ASA also warned that the risk is higher where patients on these medications have experienced nausea and vomiting.62

83.    News sources have identified the potential for serious side effects in users of Ozempic, including gastroparesis, leading to hospitalization.63 For example, NBC News reported in January 2023 that some Ozempic users were discontinuing use because their symptoms were unbearable, and one user said that five weeks into taking the medication she found herself unable to move off the bathroom floor because she had "vomited so much that [she] didn't have the energy to get up."64 CNN reported in July that one Ozempic user diagnosed with gastroparesis vomits so frequently that she had to take a leave of absence from her teaching job.65

84.    A July 25, 2023, article in Rolling Stone magazine—"Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'"—highlighted three patients who have

suffered severe gastrointestinal related events, including gastroparesis, as a result of their use of GLP-1RAs. Patient 1 (female, age 37) reported incidents of vomiting multiple times per day and being unable to eat. The patient's physician diagnosed her with severe gastroparesis and concluded that her problems were caused and/or exacerbated by her use of a GLP-1RA medication. Patient 2 (female) used Ozempic for one year and reported incidents of vomiting, including multiple times per day. The patient's physician diagnosed her with severe gastroparesis related to her Ozempic use. Patient 3 (female, age 42) experienced severe nausea both during and after she discontinued use of a GLP-1RA. In a statement to Rolling Stone, Novo Nordisk acknowledged that "[t]he most common adverse reactions, as with all GLP-1 RAs, are gastrointestinal related." Novo Nordisk further stated that while "GLP-1 RAs are known to cause a delay in gastric emptying, … [s]ymptoms of delayed gastric emptying, nausea and vomiting are listed as side effects." Novo Nordisk did not claim to have warned consumers about gastroparesis or other severe gastrointestinal issues.66

85.     On July 25, 2023, CNN Health reported that patients taking Ozempic have been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by the medication they were taking, Ozempic." Another patient taking Wegovy (semaglutide) suffered ongoing nausea and vomiting, which was not diagnosed, but which needed to be managed with Zofran and prescription probiotics.67

86.     On July 26, 2023, a New York hospital published an article to its online health blog section "What You Need to Know About Gastroparesis" entitled "Delayed Stomach Emptying Can Be Result of Diabetes or New Weight-Loss Medicines." It was reported that a growing number of gastroparesis cases had been seen in people taking GLP-1RAs. The article noted that the weight-loss drugs can delay or decrease the contraction of muscles that mix and propel contents in the

gastrointestinal tract leading to delayed gastric emptying. One concern raised was that patients and doctors often assume the symptoms of gastroparesis are reflux or other gastrointestinal conditions, meaning it may take a long time for someone to be diagnosed correctly.68

87.    In an October 5, 2023, Research Letter published in the Journal of the American Medical Association ("JAMA"), the authors examined gastrointestinal adverse events associated with GLP-1RAs used for weight loss in clinical setting and reported that use of GLP-1RAs compared with use of bupropion-naltrexone was associated with increased risk of pancreatitis, gastroparesis, and bowel obstruction.69 The study found that patients prescribed GLP-1RAs were at 4.22 times higher risk of intestinal obstruction and at 3.67 times higher risk of gastroparesis.

88.    The medical literature listed above is not a comprehensive list, and several other case reports have indicated that GLP-1RAs can cause gastroparesis and impaired gastric emptying.70

89.    Defendants knew or should have known of the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae, but they ignored the causal association. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, medical literature, including the medical literature and case reports referenced above in this Complaint.

90.    On information and belief, Defendants not only knew or should have known that their GLP-1RAs cause delayed gastric emptying, resulting in risks of gastroparesis, but they may have sought out the delayed gastric emptying effect due to its association with weight loss. For example, a recent study published in 2023 notes that "it has been previously proposed that long-acting GLP-1RAs could hypothetically contribute to reduced energy intake and weight loss by delaying GE [gastric emptying,]" and the study authors suggested "further exploration of

peripheral mechanisms through which s.c. semaglutide, particularly at a dose of 2.4. mg/week, could potentially contribute to reduced food and energy intake."71

**F.  Defendants Failed to Warn of the Risk of Gastroparesis from Ozempic and Wegovy**

91.    The Prescribing Information for Ozempic (the "Ozempic label") discloses "Warnings and Precautions" and "Adverse Reactions" but does not adequately warn of the risk of gastroparesis and its sequalae.72

92.    The Ozempic label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic patients, but it does not include these adverse reactions in its "Warnings and Precautions" section, nor does it warn that these adverse reactions are symptoms of more severe conditions, including gastroparesis. In fact, gastroparesis is not mentioned at all in the Ozempic label.

93.    Instead of properly disclosing gastrointestinal risks, the Ozempic label discloses delayed gastric emptying in the "Drug Interaction" section and notes that Ozempic "may impact absorption of concomitantly administered oral medications." Similarly, in the "Mechanism of Action" section, the Ozempic label minimizes gastrointestinal risks by stating that "[t]he mechanism of blood glucose lowering also involves a minor delay in gastric emptying in the early postprandial phase." These statements only describe the drug's mechanism of action and do not disclose gastroparesis as a risk of taking Ozempic, nor do they disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic.

94.    Similarly, Novo Nordisk's main promotional website for Ozempic (ozempic.com) includes a variety of information about the benefits of Ozempic relating to blood sugar, cardiovascular health, and weight loss, as well as "Important Safety Information" – however, Novo Nordisk does not disclose the risk of gastroparesis within the "Important Safety Information"

section of their promotional website.73

95.     In January 2020, Novo Nordisk removed the "Instructions" portion from Section 17 "Patient Counseling Information" of the Ozempic label, which had instructed prescribers to "[a]dvise patients that the most common side effects of Ozempic are nausea, vomiting, diarrhea, abdominal pain and constipation." These instructions were present in the 2017 and 2019 labels.

96.     The 2017 and 2019 labels for Ozempic also instructed physicians that "vomiting … decreases over time in the majority of patients." As a result, a physician would not only fail to appreciate vomiting as a symptom of gastroparesis but, even worse, would encourage a patient to continue using Ozempic despite symptoms of gastroparesis.

97.     In its section on "Females and Males of Reproductive Potential," the Ozempic label advises female users to discontinue Ozempic at least 2 months before a planned pregnancy due to the long washout period for semaglutide. This demonstrates that Novo Nordisk knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastroparesis and its sequelae.

98.     From the date Novo Nordisk received FDA approval to market Ozempic until the present time, Novo Nordisk made, distributed, marketed, and/or sold Ozempic without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Ozempic was causally associated with and/or could cause gastroparesis and its sequelae.

99.     The Prescribing Information for Wegovy discloses warnings, precautions, and adverse reactions causally associated with Wegovy, but it does not disclose the risk of gastroparesis. Instead of properly disclosing gastrointestinal risks, it discloses delayed gastric emptying under the "Drug Interactions" heading and notes that Wegovy "[m]ay impact absorption of concomitantly administered oral medications." The Prescribing Information does not disclose

gastroparesis as a risk of taking Wegovy, nor does it disclose gastroparesis as a side effect or condition that can result as a consequence of taking Wegovy.74

100.    The Wegovy label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Wegovy patients but does not include vomiting in its "Warnings and Precautions" section, and it does not indicate a severity of risk.75 Gastroparesis is not mentioned at all. In its section on "Females and Males of Reproductive Potential," the Wegovy label advises female users to discontinue Wegovy at least 2 months before a planned pregnancy due to the long half-life of semaglutide. This demonstrates that the Novo Nordisk Defendants knew or should have known that symptoms, such as continuous and violent vomiting, can linger long after the drugs are discontinued and shows the need to warn of gastroparesis.

101.    Similarly, the Novo Nordisk Defendants' main promotional website for Wegovy (wegovy.com) includes a variety of information about the benefits of Wegovy relating to weight loss, as well as "Important Safety Information" – however, Defendants do not disclose the risk of gastroparesis, within the "Important Safety Information" section or elsewhere on their promotional website.76

102.    None of Defendants' additional advertising or promotional materials warned prescription providers or the general public of the risks of gastroparesis and its sequalae.

103.    From the date Novo Nordisk received FDA approval to market Wegovy until the present time, Novo Nordisk made, distributed, marketed, and/or sold Wegovy without adequate warning to Plaintiff's prescribing physician(s) and/or Plaintiff that Wegovy was causally associated with and/or could cause gastroparesis and its sequelae.

104.    Defendants knew or should have known of the causal association between the use

of GLP-1RAs and the risk of developing gastroparesis and its sequelae. Defendants' actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced in this Complaint.

105.    Upon information and belief, Defendants ignored the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae.

106.    Novo Nordisk's failure to disclose information that they possessed regarding the causal association between the use of GLP-1RAs and the risk of developing gastroparesis and its sequelae, rendered the warnings for Wegovy inadequate.

107.    On information and belief, as a result of Novo Nordisk's inadequate warnings, the medical community at large, and Plaintiff's prescribing physician in particular, were not aware that Wegovy can cause gastroparesis, nor were they aware that "common adverse reactions" listed on the label might be sequelae of gastroparesis.

108.    On information and belief, had Novo Nordisk adequately warned Plaintiff's prescribing physician that Wegovy is causally associated with gastroparesis and its sequelae, then the physician's prescribing decision would have changed by not prescribing Wegovy, or by monitoring Plaintiff's health for symptoms of gastroparesis and discontinuing Wegovy when the symptoms first started.

109.    By reason of the foregoing acts and omissions, Plaintiff was and still is caused to suffer from gastroparesis and its sequelae, which resulted in severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

**FIRST CAUSE OF ACTION**
**(NEGLIGENT FAILURE TO WARN– AGAINST ALL DEFENDANTS)**

110.   Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

111.   Massachusetts law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

112.   At all times mentioned herein, Novo Nordisk designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Ozempic and Wegovy that were used by Plaintiff.

113.   Ozempic and Wegovy were expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Novo Nordisk.

114.   At all relevant times, and at the times Ozempic left Novo Nordisk's control, Novo Nordisk knew or should have known that Ozempic was unreasonably dangerous because Novo Nordisk did not adequately warn of the risk of gastroparesis and its sequelae especially when used in the form and manner as provided by Novo Nordisk.

115.   Despite the fact that Novo Nordisk knew or should have known that Ozempic and Wegovy caused unreasonably dangerous injuries, Novo Nordisk continued to market, distribute, and/or sell Ozempic and Wegovy to consumers, including Plaintiff, without adequate warnings.

116.   Despite the fact that Novo Nordisk knew or should have known that Ozempic and Wegovy caused unreasonably dangerous injuries, Novo Nordisk continued to market Ozempic and

Wegovy to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

117.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

118.    At all relevant times, given its increased safety risks, Ozempic and Wegovy were not fit for the ordinary purpose for which it was intended.

119.    At all relevant times, given its increased safety risks, Ozempic and Wegovy did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

120.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Ozempic and Wegovy into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as gastroparesis and its sequelae.

121.    At all relevant times, Plaintiff was using Ozempic and Wegovy for the purpose and in a manner normally intended.

122.    The Ozempic and Wegovy designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Novo Nordisk were defective due to inadequate warnings or instructions, as Novo Nordisk knew or should have known that the product created a risk of serious and dangerous injuries, including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, and Novo Nordisk failed to adequately warn of said risk.

123.    The Ozempic and Wegovy designed, researched, manufactured, tested, advertised,

promoted, marketed, sold, and distributed by Novo Nordisk were defective due to inadequate post-marketing surveillance and/or warnings because, after Novo Nordisk knew or should have known of the risks of serious side effects, including gastroparesis and its sequelae, as well as other severe and permanent health consequences from Ozempic and Wegovy, they failed to provide adequate warnings to users and/or prescribers of the products, and continued to improperly advertise, market and/or promote their product, Ozempic and Wegovy.

124.    The labels for Ozempic and Wegovy were inadequate because they did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic, including the increased risk of gastroparesis and its sequelae.

125.    The labels for Ozempic and Wegovy were inadequate because they did not warn and/or adequately warn that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

126.    The labels for Ozempic and Wegovy were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Ozempic.

127.    The labels for Ozempic and Wegovy were inadequate because they did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

128.    Communications made by Novo Nordisk to Plaintiff and Plaintiff's prescribing physician(s) were inadequate because Novo Nordisk failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Ozempic and Wegovy, including the increased risk of gastroparesis and its sequelae.

129.    Communications made by Novo Nordisk to Plaintiff and Plaintiff's prescribing

physician(s) were inadequate because Novo Nordisk failed to warn and/or adequately warn that Ozempic and Wegovy had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae.

130. Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff's reliance upon Defendants' warnings was reasonable.

131. Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

132. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risks of gastroparesis and its sequalae, which are causally associated with Ozempic, then he/she/they would not have prescribed Ozempic and Wegovy and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic and Wegovy so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Wegovy.

133. Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Ozempic and Wegovy had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequalae, he/she/they would not have prescribed Ozempic and Wegovy and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic and Wegovy so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Wegovy.

134. If Plaintiff had been warned of the increased risks of gastroparesis and its sequalae, which are causally associated with Ozempic and Wegovy, then Plaintiff would not have used Ozempic and Wegovy and/or suffered from gastroparesis and its sequalae.

135. If Plaintiff had been warned that Ozempic and Wegovy had not been sufficiently

and/or adequately tested for safety risks, including gastroparesis and its sequalae, then Plaintiff would not have used Ozempic and Wegovy and/or suffered gastroparesis and its sequalae.

136.    If Plaintiff had been warned of the increased risks of gastroparesis and its sequalae, which are causally associated with Ozempic and Wegovy, then Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Ozempic and Wegovy.

137.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician(s) that Plaintiff did not want to take Ozempic and Wegovy due to the risks of gastroparesis and its sequalae, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician(s) would not have prescribed Ozempic and Wegovy.

138.    By reason of the foregoing, Novo Nordisk has become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous products, Ozempic and Wegovy.

139.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective products which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff.

140.    Novo Nordisk's inadequate warnings for Ozempic and Wegovy were acts that amount to willful, wanton, and/or reckless conduct by Novo Nordisk.

141.    Said inadequate warnings for Novo Nordisk's drugs Ozempic and Wegovy were a substantial factor in causing Plaintiff's injuries.

142.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including gastroparesis and its sequalae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain,

mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

143.    As a result of the foregoing acts and omissions Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## SECOND CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY– AGAINST ALL DEFENDANTS)

144.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

145.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic and Wegovy, which were used by Plaintiff as hereinabove described.

146.    At all relevant times, Defendants expressly warranted to Plaintiff and Plaintiff's prescribing physician(s) that Ozempic and Wegovy were safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

147.    The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician(s) by way of Ozempic's and Wegovy's labels, websites, advertisements, promotional materials, and through other statements.

148.    As a result of Defendants' express warranties, Plaintiff's prescribing physician was induced to prescribe Ozempic and Wegovy to Plaintiff, and Plaintiff was induced to use Ozempic.

149.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Ozempic and Wegovy based upon their express warranties.

150.    At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic and Wegovy based upon their express warranties.

151.    At all relevant times, Defendants knew or should have known that Ozempic and Wegovy was unreasonably dangerous because of its increased risk of gastroparesis and its sequelae, especially when the drug was used in the form and manner as provided by Defendants.

152.    At all relevant times, Defendants knew or should have known that Ozempic and Wegovy had not been sufficiently and/or adequately tested for safety.

153.    The unreasonably dangerous characteristics of Ozempic and Wegovy were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

154.    The unreasonably dangerous characteristics of Ozempic and Wegovy were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drug's characteristics.

155.    At the time Ozempic and Wegovy left Defendants' control, Ozempic and Wegovy did not conform to Defendants' express warranties because Ozempic and Wegovy were not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, in that it was causally associated with increased risks of gastroparesis and its sequelae.

156.    The express warranties made by Defendants regarding the safety of Ozempic and Wegovy were made with the intent to induce Plaintiff to use the product and/or Plaintiff's

prescribing physician(s) to prescribe the product.

157. Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or Plaintiff's prescribing physician(s), it would be the natural tendency of Plaintiff to use Ozempic and Wegovy and/or the natural tendency of Plaintiff's prescribing physician(s) to prescribe Ozempic and Wegovy.

158. Plaintiff and Plaintiff's prescribing physician(s), as well as members of the medical community, relied on the express warranties of Defendants identified herein.

159. Had Defendants not made these express warranties, Plaintiff would not have used Ozempic and Wegovy and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic and Wegovy.

160. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

161. Plaintiff's injuries and damages arose from a reasonably anticipated use of the product by Plaintiff.

162. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

163. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

164. By reason of the foregoing, Plaintiff has been severely and permanently injured and

will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Ozempic and Wegovy drugs.

165.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## THIRD CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY-
## AGAINST ALL DEFENDANTS)

166.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

167.    At all relevant times, Novo Nordisk designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Ozempic and Wegovy drugs used by Plaintiff.

168.    Ozempic and Wegovy were expected to and did reach the usual consumers, handlers, and persons encountering said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Novo Nordisk.

169.    At all relevant times, Novo Nordisk impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Ozempic and Wegovy were of merchantable quality and safe and fit for its ordinary purpose.

170.    At all relevant times, Novo Nordisk knew or should have known that Ozempic and Wegovy were unreasonably dangerous because of their increased risk of gastroparesis and its sequalae, especially when the drugs were used in the form and manner as provided by Novo

Nordisk.

171.    At all relevant times, Novo Nordisk knew or should have known that Ozempic and Wegovy had not been sufficiently and/or adequately tested for safety.

172.    At the time Ozempic and Wegovy left Novo Nordisk's control, Ozempic and Wegovy did not confirm to Novo Nordisk's implied warranty and were unfit for their ordinary purpose because Novo Nordisk failed to provide adequate warnings of the drugs' causal association with increased risk of gastroparesis and its sequalae.

173.    At all relevant times, Novo Nordisk reasonably anticipated and expected that prescribing physician(s), such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Ozempic and Wegovy for use by their patients to improve glycemic control in people with type 2 diabetes, reduce cardiovascular risk, and/or to promote weight loss.

174.    At all relevant times, Novo Nordisk reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Ozempic and Wegovy for their ordinary purpose.

175.    Despite the fact that Novo Nordisk knew or should have known that Ozempic and Wegovy causes unreasonably dangerous injuries, gastroparesis and its sequalae, Novo Nordisk continued to market, distribute, and/or sell Ozempic and Wegovy to consumers, including Plaintiff, without adequate warnings.

176.    The unreasonably dangerous characteristics of Ozempic and Wegovy were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

177.    The unreasonably dangerous characteristics of Ozempic and Wegovy were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary

knowledge common to prescribing physician as to the drug's characteristics.

178.    Plaintiff reasonably relied on Novo Nordisk's implied warranty of merchantability relating to Ozempic's and Wegovy's safety and efficacy.

179.    Plaintiff reasonably relied upon the skill and judgment of Novo Nordisk as to whether Ozempic and Wegovy were of merchantable quality and safe and fit for its intended use.

180.    Upon information and belief Plaintiff's prescribing physician(s) relied on Novo Nordisk's implied warranty of merchantability and fitness for the ordinary use and purpose relating to Ozempic and Wegovy.

181.    Upon information and belief Plaintiff's prescribing physician(s), reasonably relied upon the skill and judgment of Novo Nordisk as to whether Ozempic and Wegovy were of merchantable quality and safe and fit for its intended use.

182.    Had Novo Nordisk not made these implied warranties, Plaintiff would not have used Ozempic and Wegovy and/or, upon information and belief, Plaintiff's prescribing physician(s) would not have prescribed Ozempic and Wegovy, and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Ozempic and Wegovy to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Wegovy.

183.    Novo Nordisk breached the aforesaid implied warranty of merchantability because the drugs Ozempic and Wegovy were not fit for its intended purpose.

184.    Defendants' breaches of implied warranty of merchantability were a substantial factor in causing Plaintiff's injuries.

185.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequalae, which resulted in other severe and

personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

186.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## FOURTH CAUSE OF ACTION
## (FRAUD BY OMISSION-AGAINST ALL DEFENDANTS)

187.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

188.    At all relevant times, Novo Nordisk designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Ozempic and Wegovy, which were used by Plaintiff as hereinabove described.

189.    At all relevant times, Novo Nordisk knew or should have known that Ozempic and Wegovy had not been adequately and/or sufficiently tested for safety.

190.    At all relevant times, Novo Nordisk knew or should have known that Ozempic and Wegovy were unreasonably dangerous because of the increased risk of gastroparesis and its sequalae, especially when the drug was used in the form and manner as provided by Novo Nordisk.

191.    Novo Nordisk had a duty to disclose material information about Ozempic and Wegovy to Plaintiff and Plaintiff's prescribing physician(s), namely that Ozempic and Wegovy are causally associated with increased risk of gastroparesis and its sequalae, because Novo Nordisk

has superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician(s) by reasonable inquiry, and Novo Nordisk knew or should have known that Plaintiff and Plaintiff's prescribing physician would act on the basis of mistaken knowledge.

192.    Nonetheless, Novo Nordisk consciously and deliberately withheld and concealed from Plaintiff's prescribing physician(s), Plaintiff, the medical and healthcare community, and the general public this material information.

193.    Although the Ozempic and Wegovy label lists nausea, vomiting, diarrhea, abdominal pain, and constipation as common adverse reactions reported in Ozempic and Wegovy patients, it does not mention gastroparesis as a risk of taking Ozempic and Wegovy, nor does it disclose gastroparesis as a chronic condition that can result as a consequence of taking Ozempic and Wegovy.

194.    Novo Nordisk's promotional websites for Ozempic and Wegovy similarly do not disclose that Ozempic and Wegovy are causally associated with increased risk of gastroparesis and its sequelae.

195.    Novo Nordisk's omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician(s), and patients, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Ozempic and Wegovy for treatment of type 2 diabetes, reduction of cardiovascular risk, or weight loss.

196.    Novo Nordisk knew or should have known that Plaintiff's prescribing physician(s) would prescribe, and Plaintiff would use Ozempic and Wegovy without the awareness of the risks of serious side effects, including gastroparesis and its sequelae.

197.    Novo Nordisk knew that Plaintiff and Plaintiff's prescribing physicians (s) had no way to determine the truth behind Novo Nordisk's misrepresentations and concealments surrounding Ozempic and Wegovy, as set forth herein.

198.    Upon information and belief, Plaintiffs prescribing physician(s) justifiably relied on Novo Nordisk's material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Ozempic and Wegovy.

199.    Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of gastroparesis and its sequelae causally associated with Ozempic and Wegovy, they would not have prescribed Ozempic and Wegovy and/or would have provided Plaintiff with adequate information regarding the increased risk of gastroparesis and its sequelae causally associated with Ozempic and Wegovy to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Wegovy.

200.    Upon information and belief, had Plaintiff's prescribing physician(s) been told that Ozempic had not been sufficiently and/or adequately tested for safety risks, including gastroparesis and its sequelae, they would not have prescribed Ozempic and Wegovy and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Ozempic to allow Plaintiff to make an informed decision regarding Plaintiff's use of Ozempic and Wegovy.

201.    Plaintiff justifiably relied on Novo Nordisk's material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Ozempic and Wegovy.

202.    Had Plaintiff been informed of the increased risks causally associated with Ozempic and Wegovy, Plaintiff would not have used Ozempic and Wegovy and/or suffered

gastroparesis and its sequelae.

203.    Defendants' fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

204.    As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including gastroparesis and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

205.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and

deter future similar conduct;

3.      Awarding Plaintiff the costs of these proceedings; and

4.      Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Dated: August 1, 2024                    RESPECTFULLY SUBMITTED,

*/s/ Jonathan M. Sedgh*
Jonathan M. Sedgh
Morgan & Morgan
199 Water Street, Suite 1500
New York, NY 10038
Phone: (212) 738-6839
*jsedgh@forthepeople.com*

Nicole Lovett
Morgan & Morgan
201 N Franklin St, 7th Floor
Tampa, FL 33602
Phone: (813) 275-5263
Fax: (813) 222-2455
*nlovett@forthepeople.com*

*Attorneys for Plaintiff*